**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BOSS EXOTICS, LLC,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CASE NO. 3:20-CV-1835-BK** |
| | § | |
| **CROSTA AND PARTNERS, LLC D/B/A ROYALTY EXOTICS, CROSTA AND PARTNERS, LLC (CA), CROSTA AND PARTNERS, LLC (AK), LUXURY LEASE COMPANY; AND HOUSTON CROSTA,** | § | |
| **DEFENDANTS.** | § | |

**MEMORANDUM OF DECISION**

This is a breach of contract action arising from the sale of a 2017 McLaren 720S (the "Vehicle"). Pursuant to the parties' consent to proceed before the undersigned United States magistrate judge, a bench trial was conducted on January 5, 2026. After careful consideration of the relevant evidence presented at the trial, the Court now sets out its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. For the reasons explained below, the Court finds in favor of Defendants on all claims.

## I. FINDINGS OF FACT

### A. Parties and Vehicle History

1. Plaintiff Boss Exotics, LLC, is a limited liability company with its principal place of business in Dallas County, Texas. Plaintiff's sole member is Rodney James McGaffey, a Texas citizen. Plaintiff operates a family-owned exotic car rental business.

2. Defendant Crosta and Partners, LLC d/b/a Royalty Exotics ("Royalty Exotics") is a limited liability company with its principal place of business in Las Vegas, Nevada. The LLC is comprised of three members, all of whom reside in Nevada.

3. Defendant Houston Crosta ("Crosta") is an individual residing in Las Vegas, Nevada, and is the owner and officer of Royalty Exotics.

4. Royalty Exotics purchased the McLaren 720S Coupe at issue (the "Vehicle") in October 2017 for $360,000 and put it into rental service approximately one week after purchase.

5. The McLaren 720S model was first manufactured in 2017 and the Vehicle's MSRP was approximately $342,000.

6. Royalty Exotics rented the Vehicle primarily to tourists in Las Vegas, and by the time of sale the Vehicle had accumulated over 50,000 miles.

7. In May 2019, the Vehicle sustained undercarriage damage after falling off a tow truck, and in November 2019, the Vehicle was also involved in a separate collision incident through which it sustained external damage.

## B. The Transaction

8. On February 17, 2020, Royalty Exotics posted an eBay listing advertising the sale of a used 2018 McLaren 720s VIN# SBM14DCA6JW000532 ("Vehicle") for $145,000. The listing described the Vehicle as being sold "as is" and included 17 photographs, some of which showed visible exterior damage, including a missing side mirror and dents/scratches on multiple panels. The eBay listing did not mention the manufacturer's warranty status or disclose the details and extent of the Vehicle's undercarriage damage or other mechanical defects.

9. On the same day Royalty posted the eBay listing, Plaintiff's representative, Rodney James McGaffey ("McGaffey"), contacted Crosta using the telephone number provided on the

listing. McGaffey and Crosta exchanged several texts and a phone call during which they discussed the Vehicle's condition, including some of the visible external damage.

10. Relying on that conversation and without conducting a pre-purchase inspection of the Vehicle, McGaffey submitted a $135,000 offer through eBay the next day, February 18, 2020, at approximately 10:22 AM pacific time. Royalty accepted the offer on eBay two minutes later and Crosta simultaneously texted McGaffey, confirming that the offer was "accepted."

11. Crosta received two automated emails from eBay confirming the $135,000 offer and Royalty's subsequent acceptance and sale of the Vehicle. The second confirmation email identified the buyer as Tom Durbin and/or Euro Capital and provided a shipping address associated with a Kelly Brooks in Austin, Texas.

12. Following the eBay acceptance, McGaffey sent Crosta a Bill of Sale (the "Bill of Sale") via DocuSign. Within approximately 30 seconds of receiving it, and without having read it, Crosta signed the Bill of Sale using DocuSign's "sign" function.

13. The Bill of Sale included, among other terms, that the Vehicle: (a) "runs and drives without any mechanical problems or indications and issues by the vehicle notification system on the dash"; and (b) "has no other scratches, dents or damage of any kind other than the one that is shown on the eBay listing." The Bill of Sale also expressly identified the eBay listing through its item number "#143531498826."

14. The Bill of Sale further provided that the seller guarantees the Vehicle has not been involved in any undisclosed accidents and agrees to pay back 50 percent of the purchase price to the buyer the same day if it has. The Bill of Sale also provides that if the Vehicle is received with any issues not disclosed on the eBay listing, the seller agrees to pay for all costs of repairs and loss of use for each day the Vehicle is being repaired at a market rate.

15. Shortly after signing the Bill of Sale, Crosta texted McGaffey stating that he had "just read" the Bill of Sale and that it was "not good" for him. Crosta also asked that the Bill of Sale be voided and substituted for a Nevada bill of sale or that McGaffey provide some other written acknowledgement that the transaction was "as is" or "wholesale." He further stated that if McGaffey insisted on using that form, he would "just keep the car" due to the liability under the Bill of Sale's terms.

16. In response, McGaffey stated that Plaintiff's insurance company required it to use that form to "protect from fraud" and that Crosta shouldn't worry because Plaintiff wouldn't come after him for anything "if the car is as described." McGaffey did not agree to void the Bill of Sale.

17. Plaintiff subsequently wired $135,000 to Royalty Exotics, and Royalty shipped the Vehicle to Plaintiff.

### C. Post-Sale Discovery of Defects

18. After receiving the Vehicle on February 23, 2020, Plaintiff took the Vehicle to the McLaren dealership. At the dealership, Plaintiff learned that the manufacturer's warranty had been revoked and that the Vehicle had undercarriage damage and mechanical defects that required repair.

19. After learning of the damage, Plaintiff submitted a claim through eBay which was unsuccessful. Plaintiff never asked to return the Vehicle to Defendant or for a refund.

## II. Conclusions of Law

At the conclusion of the bench trial, the Court granted judgment as a matter of law in favor of Crosta and Partners, LLC (California), Crosta and Partners, LLC (Alaska), and Luxury

Lease Company, on all claims asserted against them.[1] *See* Doc. 165 at 109 (Tr. 109:12-20). Thus, the claims remaining for adjudication include Plaintiff's claims against Royalty Exotics and Houston Crosta for: (1) breach of contract; (2) fraudulent inducement; (3) negligent misrepresentation, (4) fraud by omission; (5) and violations of the Texas Deceptive Trade Practices Act—with Plaintiff seeking to impose liability on Houston Crosta under an alter-ego theory.

### A. Alter Ego Theory

The Court first addresses Plaintiff's theory of alter-ego liability. "In Texas, members and managers of a limited liability company are generally shielded from personal liability for the company's debts and obligations." *Lensabl, Inc. v. RBH SPE ONE, LLC*, No. 25-BC08B-13, 2025 WL 3124657, at *4 (Tex. Bus. Ct. Nov. 5, 2025) (citations omitted). However, under the alter ego doctrine, a court may impose individual liability on an entity's owners or officers where "there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *S.E.C. v. Res. Dev. Intern., LLC,* 487 F.3d 295, 302 (5th Cir. 2007). "Injustice" requires more than a subjective sense of unfairness, and instead refers to abuses such as "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like." *SSP Partners v. Gladstrong Invs.* (USA) Corp., 275 S.W.3d 444, 445 & (Tex. 2008). "Thus, to pierce the corporate veil and impose liability under an alter-ego theory, the plaintiff must demonstrate (1) that the entity on which it seeks to impose liability is the alter ego of the [liable entity], and (2)

---

[1] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000. Because jurisdiction is based on the diversity of citizenship, Texas law governs Plaintiff's claims. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct personal benefit." *U.S. KingKing, LLC v. Precision Energy Services, Inc.*, 555 S.W.3d 200, 213-14 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Here, Plaintiff failed to present any evidence showing that Houston Crosta and Royalty Exotics were alter egos of each other such that Crosta should be held individually liable for Royalty's actions. Specifically, Plaintiff presented no evidence demonstrating: (1) a commingling of funds between Crosta and Royalty; (2) that Houston made representations that he would financially back the corporation; (3) that Houston diverted company profits for personal use; (4) undercapitalization of Royalty; (5) or any absence of corporate asset separateness. *See Mancorp Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (identifying these as factors relevant to the alter ego status). Nor did Plaintiff offer any evidence of Crosta's use of Royalty Exotics as a corporate vehicle to perpetuate fraud. Indeed, the evidence regarding the relationship between Crosta and Royalty appears to be limited to McGaffey's testimony that Royalty Exotics was Crosta's company. *See* Doc. 165 at 83 (Tr. 83:18-22). However, "[a]n individual's standing as an officer, director or majority shareholder of an entity alone is insufficient to support a finding of alter ego." *Khajeie v. Garcia-Martinez*, No. 5-17-1010-cv, 2018 WL 3424365, at *3 (Tex. App.—Dallas July 16, 2018, no pet.).

Absent proof of the relationship between the Crosta and the Royalty and that he used Royalty as a vehicle to perpetuate fraud, Plaintiff has not met its burden of proving alter ego liability. Because the Court finds that Houston Crosta is entitled to judgment in his favor on each of Plaintiff's claims against him, the Court's remaining conclusions pertain only to Royalty Exotics.

### B. Breach of Contract

The elements of a breach of contract claim under Texas law are "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (citation omitted).[2] This matter is also governed by the Uniform Commercial Code ("UCC"), as adopted by the Texas Business and Commerce Code, because the disputed transaction involves the sale of goods. *See* TEX. BUS. & COM. CODE § 2.102.

#### *1. The eBay Transaction Formed a Valid and Enforceable Contract.*

Under Texas law, the four basic elements of a valid contract are: "(1) offer; (2) acceptance; (3) meeting of the minds as to subject matter and essential terms; and (4) consideration or mutuality of obligation." *Chu de Quebec-Universite Laval v. Dreamscape Dev. Grp. Holdings, Inc.*, 837 F.Supp.3d 819, 837 (E.D. Tex. 2026) (citation omitted). Section 2.204 of the UCC supplements these elements, providing that contracts for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." TEX. BUS. & COM. CODE § 2.204(a). The UCC further provides that contracts "for the sale of goods for $500 or more" must be in writing and "signed by the party against whom enforcement is sought." TEX. BUS. & COM. CODE § 2.201(a).

---

[2] As an initial matter, the Court rejects Defendants' contention that Boss Exotics lacks standing to bring suit based on the underlying agreement. Although neither Boss Exotics nor its agent, Rodney McGaffey, were listed as the buyer of the Vehicle on the eBay documents, sufficient evidence in the record exists to prove that McGaffey was in fact the individual who submitted the $135,000 bid which formed the basis for the agreement. Indeed, Defendants themselves submitted evidence showing that the "buyer" listed on the eBay documents—Tom Durbin—was a known alias of McGaffey's. *See* Doc. 153-15 at 6 (Arrest warrant affidavit stating that McGaffey used aliases including the name of his stepfather "Thomas Durbin.").

Here, there is no dispute that Plaintiff submitted a $135,000 bid to purchase the Vehicle, and that Defendant accepted that offer through eBay. Doc. 167 at 11; Doc. 168 at 3. Although the parties previously took inconsistent positions as to whether that acceptance formed a binding contract, Plaintiff appears to concede this point for the first time in its post-trial briefing. *See* Doc. 169 at 7 (stating that "[t]he binding contract . . . was formed on February 18, 2020, when Royalty Exotics accepted Boss Exotics' offer of $135,000 through eBay"). The evidence in the record also supports this conclusion.

On the same day the Vehicle was listed for sale, McGaffey, acting on Plaintiff's behalf, contacted Defendant at the phone number provided on the eBay listing to inquire about the Vehicle's condition. *See* Doc. 153-3 at 1; Doc. 165 at 87 (Tr. 87:13-15). The following day, McGaffey submitted the $135,000 bid on eBay and contemporaneously confirmed the offer by text, stating "I just sent you an offer on eBay. If you can accept I can wire the money over today." Doc. 153-8 at 1; Doc. 153-3 at 1. Defendant, through Crosta, then accepted the offer through eBay and confirmed its acceptance by text, stating simply, "accepted," followed by a separate text providing Defendant's routing number and address for payment. Doc. 153-7 at 1; Doc. 153-3 at 1.

The Court concludes that these actions formed a valid and binding contract. Although the auction occurred online, rather than in-person, general principles of auction law provide that acceptance of a bid creates a binding contract between the seller and the bidder. *See In re GWI PCS 1 Inc.*, 230 F.3d 788, 807 (5th Cir. 2000) (noting that the close of an auction—ordinarily denoted by the fall of the auction hammer—"signals acceptance of the offer and creates a binding contract between the seller and the high bidder."). The parties' communications and conduct establish a meeting of the minds as to the contract's essential terms, and eBay's

confirmation emails—containing the quantity, price, and seller's email address—satisfy § 2.201(a)'s writing requirement. *See, e.g.*, *Left Gate Property Holdings, Inc. v. Scott*, No. 1-10-334-cv, 2011 WL 1326237, at *6-7 (Tex.App.—Houston [1st Dist.] Apr. 7, 2011, no pet.) (affirming judgment for breach of contract arising from buyer's use of eBay's "Buy it Now" feature to purchase a vehicle and holding that the eBay advertisement and buyer's testimony provided legally sufficient evidence of the existence and terms of the agreement); *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 240-41 (5th Cir. 2012) (holding that email and instant message confirmations sent immediately after the parties reached an agreement satisfied § 2.201(a) where the confirmations identified the quantity, price, and product).

Because the eBay transaction formed a valid contract, the subsequent Bill of Sale is binding only to the extent it supersedes or modifies the contract's pre-existing terms.[3] As explained below, the Court concludes that the Bill of Sale has neither effect.

***2. The Bill of Sale Did Not Modify the Terms of the eBay Agreement.***

"Modification of a contract is some change in an original agreement which introduces a new or different element into the details of the contract but leaves its general purpose and effect undisturbed." *Chu,* 837 F.Supp.3d at 838 (quoting *Enserch Corp. v. Rebich*, 925 S.W.2d 75, 83

[3] Although Plaintiff appears to have abandoned the argument, the Court takes care to note that the Bill of Sale is not a separate standalone contract. *Compare* Doc. 149 at 3, *with* Doc. 169 at 7. As the trial evidence established, the Bill of Sale expressly incorporated the eBay listing by reference. *See* Doc. 153-1 at 1 (stating that "the vehicle also has no scratches, dents or damage of any kind other than what is sown on eBay item #143531498826 . . ."). The Bill of Sale therefore was clearly intended to supplement the underlying eBay transaction, which itself created a binding contract. *See Chu*, 837 F.Supp.3d at 837-38 (concluding that letter sent after a purchase order and invoice was not a standalone contract because it "clearly exist[ed] in the context" of the earlier documents, which themselves created a binding contract).

(Tex. App.—Tyler 1996, writ dism'd by agr.)). The UCC provides that an agreement to modify a contract "needs no consideration to be binding." TEX. BUS. & COM.CODE § 2.209(a). However, a modification is valid only if all parties to an agreement have consented to it. *See Hovas v. O'Brien,* 654 S.W.2d 801, 803 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd) ("One party by itself cannot modify a contract after it has been entered into, but rather all parties to an agreement must consent to the modification for the modification to be valid."). Thus, as with the issue of contract formation, the determination of whether the parties have agreed to a purported modification is fundamentally one of intent. *Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 228–29 (Tex.1986) ("Whether a contract is modified depends on the parties' intentions and is a question of fact."). The party asserting modification bears the burden of proving mutual assent. *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F.Supp.2d 831, 849 (S.D. Tex. 2011) (citation omitted). To satisfy this burden, the party must show that the other side both "(1) had notice of the change and (2) accepted the change." *Id.*

Here, Plaintiff failed to meet this burden. Defendant's trial evidence establishes that the Vehicle's eBay listing expressly provided that the Vehicle was sold "as is." Doc. 153-2 at 2; Doc. 165 at 115 (Tr. 115:3-4). Yet Plaintiff's subsequent Bill of Sale included several terms that are at best inconsistent with that provision. The Bill of Sale states, among other terms, that "[t]he seller guarantees the vehicle . . . has [not] been involved in any accidents no matter how minor," and that the Vehicle "runs and drives without any mechanical problems or indications of issues by the vehicle notification system[.]" Doc. 153-1 at 1. It further provides that if the Vehicle was involved in an undisclosed accident, the seller must "pay back 50% of the purchase price to the buyer the same day" and if, if the Vehicle is received with any other issues, "the

seller agrees to pay for all costs of repairs . . . and loss of usage for each day the vehicle is being repaired" within 10 days of notice. Doc. 153-1 at 1.

Notwithstanding the apparent conflict between these terms and existing "as is" provision, Plaintiff contends that the Bill of Sale constitutes the parties' final written agreement, as evidenced by both Defendant's execution of the document and its subsequent performance. Doc. 169 at 9-11. The Court disagrees.

Plaintiff correctly states that the existence of mutual assent is an objective inquiry, "turning on what the parties said and did," rather than on their subjective states of mind. *Chubb Lloyds Ins. Co. of Texas v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 151 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (citation omitted). Generally, a party's signature and delivery of a written contract is sufficient evidence of that party's assent to the agreement. *Id.* (citing *Phillips v. Carlton Energy Grp.*, 475 S.W.3d 265, 277 (Tex. 2015)); *see also Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind."). However, a party's signature or other written expression which would otherwise express assent may not be binding if their other actions make it clear that they did not intend to be bound. *See W.R. Larock, D.C., P.C. v. Enabnit*, 812 S.W.2d 670 (Tex. App.—El Paso 1991, no pet.) (holding that "no contract is formed by the signing of an instrument when the offeree is aware that the offeror does not intend to be bound by the wording of the instrument); *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 202 (Tex. 2021) (holding that courts "can disregard a written or verbal expression of intent if, all things considered, it is belied by the party's other actions.") (emphasis in original).

Although Defendant's agent, Crosta, signed and delivered the Bill of Sale, the objective circumstances surrounding his signing make it apparent that Defendant never intended to agree to its terms. As Plaintiff acknowledges, Crosta testified that he signed the Bill of Sale via DocuSign without reading it and "within approximately thirty seconds" of its receipt. Doc. 168 at 2; *see also* Doc. 165 at 119 (Tr. 119:15-24). Crosta further testified that he signed Bill of Sale under the belief that it merely formalized the agreement's basic terms and that he would not have agreed to the additional terms had he been aware of them. Doc. 165 at 120 (Tr. 120:2-14). Crosta's subsequent actions support his testimony.

Almost immediately after signing and returning the Bill of Sale, Crosta sent a text to Plaintiff's agent objecting to the additional terms and requesting that Plaintiff "send a different bill of sale . . . and void the one [Crosta] signed." Doc. 165 at 130 (Tr. 130:3-6); Doc. 153-3 at 4. In the ensuing text exchange, Crosta repeatedly reiterated that the "car is sold as is," that this was "a wholesale transaction," and that he did not want to be liable for costs of repairs in the future. Doc. 153-3 at 3-4. In response, Plaintiff's agent, McGaffey, insisted that the bill of sale was required by Plaintiff's insurance company to protect against fraud and that Defendant had nothing to worry about "if the car is as described." Doc. 153-3 at 4-5. Defendant nevertheless continued to object, resulting in the following exchange:

- **Defendant:** *If you have to use that one I'll just keep the car. It's too much liability.*
- **Plaintiff:** *It's fine. I'm not asking you to warranty the car personally after we get it . . . Mainly that bill of sale protects us from the car being a flood etc. I see from the videos and everything looks good so no worries.*
- **Defendant:** *Ok please just write me an email saying you understand this is a wholesale deal.*

- **Plaintiff:** *Not sure what your definition of a wholesale deal is. You are selling the car on eBay so we are assuming it comes as described. Like I said the bill of sale is to protect us from fraud and misrepresentation that's all.*

- **Defendant:** *Wholesale means your [sic] buying the car as is. It's been in an accident. It's also a rental. . . . I don't want to be responsible if something else is broken[.]*

Doc. 153-3 at 4-5. Notwithstanding the Bill of Sale's execution, Defendant's objective conduct and statements both before and immediately after signing the Bill of Sale show that there was no mutual assent. *See, e.g, Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 526 (Tex. App.—Amarillo 1998, pet. denied) (holding that lessee's conduct, including his prior agreement with vendor to terms different from those in the third-party offer made it apparent that the lessee did not intend to be bound by the terms when he signed the agreement).

The Court further notes that these communications and Plaintiff's subsequent conduct raise questions about its own intent to be bound by the Bill of Sale. Notably, Plaintiff submitted no evidence showing that it sought to enforce the Bill of Sale's terms upon learning of the Vehicle's defects. Indeed, despite discovering that the vehicle had been in a non-disclosed accident, Plaintiff did not seek to enforce the extremely favorable provision which would require Defendant to reimburse Plaintiff "50% of the purchase price . . . the same day." Doc. 97-1 at 5. Instead, Plaintiff conceded that it filed a claim with eBay through its agent, thus suggesting that Plaintiff believed the eBay transaction, rather than the Bill of Sale, was the binding agreement. Doc. 148 at 56-57 (McGaffey Depo. at 259:23-25; 260:1-3). *See Camtu Enterprises, LLC v. Hegar*, No. 3-15-516-cv, 2017 WL 2927567, at *6 (Tex. App.—Austin July 7, 2015, no pet.) ("If compliance with the underlying agreement is not sought or even encouraged by either party, the validity of the contract may be questionable.").

Plaintiff likewise failed to submit sufficient evidence to support an inference that Defendant's subsequent performance manifested its assent to the Bill of Sale's terms. Although it is well-established that "ratification can arise from acceptance of benefits or from other intentional acts," courts are not required to disregard clear objections any time a party commits some act consistent with ratification. *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 202 (Tex. 2021). Rather, Defendant's acceptance of payment and subsequent shipment of the Vehicle are only manifestations of intent if a reasonable person would understand them as such "in view of the surrounding circumstances." *Id*; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 19 cmt. c (1981) ("[E]ven though the intentional conduct of a party creates an appearance of assent on his part, he is not responsible for that appearance unless he knows or has reason to know that his conduct may cause the other party to understand that he assents.").

As outlined above, in the face of Defendant's stated preference to disregard the sale and keep the Vehicle, Plaintiff knew that the Bill of Sale's terms were facially incongruent with the "as is" agreement, knew that Defendant objected to these terms, and nevertheless insisted that the terms were merely defenses against fraud and misrepresentation. Considering these facts, Defendant's acceptance of payment and subsequent shipment cannot reasonably be viewed as silent assent to the Bill of Sale as the binding agreement. *See, e.g., Strickhausen*, 629 S.W.3d at 203 (holding that, where the counterparty knew of the party's consistent objections and continued assertion of her right to withhold consent, the party's acceptance of payments could not reasonably be understood as consenting to the disputed arrangement).

Absent a showing that there was a "meeting of the minds" with respect to any of the Bill of Sale's terms, the additional terms are not valid modifications of the contract by which the parties were bound. *Hovas*, 654 S.W.2d at 803; *see also Axelson, Inc. v. McEvoy-Willis*, 7 F.3d

1230, 1233 (5th Cir. 1993) ("Because the parties had a meeting of the minds months before, the additional terms on the June form purchase order never became part of the contract."). Accordingly, because Plaintiff's breach of contract claim rests on Defendant's performance of these non-binding terms, the Court finds that Plaintiff has failed to prove breach as a matter of law. Defendant is therefore entitled to judgment in its favor on this claim.

### C. Fraudulent Inducement and Negligent Misrepresentation

To prevail on a claim for fraudulent inducement under Texas law, a plaintiff must prove: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). In the context of a fraudulent inducement claim, these elements "must be established as they relate to an agreement between the parties." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (citation omitted). Relatedly, a claim for negligent misrepresentation requires a plaintiff to prove that: "(1) the defendant made a representation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation." *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 762 (N.D. Tex. 2017) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

Here, Plaintiff premises its fraudulent inducement and negligent misrepresentation claims on alleged misrepresentations made in connection with the Vehicle's warranty status and mechanical condition. Doc. 168 at 7. Plaintiff, however, did not prove that Defendant made any affirmative representations about either the Vehicle's mechanical condition or warranty, much less that these representations were false. On the contrary, Plaintiff's agent admitted that both the eBay listing and the Bill of Sale are silent as to the status or existence of any manufacturer's warranty. Doc. 165 at 84 (Tr. 84:13-25; 94:12-14). Plaintiff otherwise presented no testimony or evidence as to when the alleged misrepresentation occurred, or what it included. Indeed, the only evidence in the record on this point appears to be Crosta's testimony that the parties did not discuss the manufacturer's warranty prior to the eBay transaction. Doc. 165 at 137 (Tr. 137:20-25). Because Plaintiff failed to establish that Defendant made any misrepresentations about the Vehicle's warranty that Plaintiff relied on, Plaintiff has not met its burden of proving inducement or misrepresentation under this theory.

To the extent Plaintiff's fraud claims are based on alleged misrepresentations about the Vehicle's condition, they fare no better. Plaintiff presented no evidence or testimony showing that Defendant represented the condition of the Vehicle as anything other than what the eBay listing described: a used 2018 McLaren 720s with over 50,000 miles and various external damage. *See* Doc. 153-2, *passim.* Insofar as Plaintiff argues that the Bill of Sale's terms constituted representations about the Vehicle's condition, this argument fails for the same reasons identified above. Because Defendant did not consent to these terms, Plaintiff cannot be said to have justifiably relied on them. Accordingly, Plaintiff's fraudulent inducement and negligent misrepresentation claims fail insofar as they are based on this theory.

### D. Fraud by Omission

Because Plaintiff appears to challenge Defendant's *failure* to disclose information, *see* Doc. 169 at 11, any fraud resulting fraud claim is more properly characterized as fraud by omission. To establish fraud my omission or fraud by-nondisclosure, the plaintiff must show that: "(1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019).

Here, Plaintiff alleges that Defendant failed to disclose material information concerning the status of the manufacturer's warranty. Doc. 169 at 12. But even assuming, *arguendo,* that Defendant knew and deliberately failed to disclose that the Vehicle's warranty had been cancelled, Plaintiff must still establish that Defendant had a duty to disclose that fact. *See* ! *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001) (explaining that a failure to disclose information does not constitute fraud unless there is a duty to do so). Plaintiff again failed to meet this burden. Plaintiff presented no evidence of a confidential or fiduciary relationship between the parties, nor any evidence that Defendant discovered new information that made an earlier representation untrue or misleading. *Id.*

Absent evidence of such relationship or other circumstances giving rise to a duty to disclose, Plaintiff cannot establish the essential elements of its fraud by non-disclosure claim. Accordingly, the Court finds in favor of Defendant on this claim.

### E. DTPA

Plaintiff likewise presented insufficient evidence to establish a DTPA claim. The DTPA provides a private cause of action for consumers subjected to false, misleading, or deceptive acts or practices. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). The threshold inquiry for any DTPA claim is therefore whether the plaintiff qualifies as a "consumer" under the Act.

The DTPA defines consumer as "an individual, partnership, [or] corporation . . . who seeks or acquires by purchase or lease any goods or services, *except* that the term does not include a business consumer that has assets of $25 million or more[.]" TEX. BUS. & COM. CODE ANN. § 17.45(4) (emphasis added). The term "'[b]usiness consumer' means an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use." *Id.* § 17.45(10). The defendant, rather than the plaintiff, "has the burden to plead and prove the applicability of the $25,000,000 exception to business consumer status as an affirmative defense." *Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 674 (Tex. 1990); *see also Hybrid Energy Servs., Ltd. v. Magness Oilfield Brokerage, LLC*, No. 5:16-cv-90, 2016 WL 11673473, at *2 (N.D. Tex. Aug. 5, 2016) (Cummings, J.) (recognizing that "the $25-million-dollar exception is an affirmative defense that must be pleaded and proved by the DTPA defendant." (citation omitted)).

Here, Defendant neither pleaded the business consumer exception nor offered any proof that Plaintiff Boss Exotics, LLC had assets of $25 million dollars or greater at any time relevant to this suit. Defendant therefore cannot invoke that defense for the first time in its post-trial briefing. *See Compusolve, Inc. v. Urban Eng'g, Inc.*, 799 S.W.2d 374, 377 (Tex. App.—Corpus Christi-Edinburg 1990, no pet.) (holding that any defense regarding consumer status was waived

where defendant neither pleaded the exception nor offered any proof that the plaintiff had assets of 25-million dollars or greater).

However, even assuming Plaintiff qualifies as a "consumer" under the DTPA, the claim nevertheless fails because Plaintiff presented no evidence establishing any of the claim's essential elements. To prevail on a DTPA claim, a consumer must establish that the defendant "either engaged in false, misleading or deceptive acts (i.e., violated a specific laundry-list provision of the DTPA) or engaged in an unconscionable action or course of action," and that the violation or action was a producing cause of the plaintiff's injury. *Windle v. Synthes USA Prods., LLC*, No. 3:11-cv-2591, 2012 WL 1252550, at *4 (N.D. Tex. Apr. 13, 2012) (Fitzwater, C.J.) (citing *Amstadt*, 919 S.W.2d at 649). For the reasons outlined *supra*, Plaintiff failed to meet its burden of proof on either of these elements.

By agreeing to purchase the Vehicle "as is," Plaintiff agreed to make its "own appraisal of the bargain and to accept the risk that [it] may be wrong." *Prudential Ins. Co. of Am. V. Jefferson Assocs. Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995). Because "[t]he sole cause of the buyer's injury in such circumstances . . . is the buyer [itself]," the controlling "as is" clause prevents Plaintiff from proving that Defendant's conduct was the cause of any harm. *Id.* (holding that a valid "as is" clause "negates causation essential to recovery" of DTPA violations). Moreover, even if the Court were to find that the Bill of Sale was the governing agreement, which it does not, Defendant's alleged failure to comply with its terms does not constitute a DTPA violation. *See Ashford Dev., Inc. v. USLife Real Estate Servs.*, 661 S.W.2d 933, 935 (Tex. 1983) ("[A] mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA."). Therefore, the Court finds in Defendant's favor with respect to the DTPA claim.

## III. CONCLUSION

For the foregoing reasons, the Court determines that Plaintiff should take nothing on its claims against Defendant, and therefore, judgment will issue in favor of Defendants.

**SO ORDERED** on September 30, 2026.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE